Filed 4/8/13  P. v. Rodriguez CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>ANTONIO POBLANO RODRIGUEZ,<br><br>　　　Defendant and Appellant. | B238002<br><br>　(Los Angeles County<br>　Super. Ct. No. BA380466)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>[CHANGE IN JUDGMENT] |

THE COURT:*


It is ordered that the opinion filed herein on March 18, 2013, be modified as follows:

1.　　On page 1, line 2 of the first full paragraph, "Affirmed" is changed to "Affirmed as modified."

2.　　On page 9, after the second full paragraph which ends with the phrase "a fair trial was not infringed," the following paragraph is added:

The parties agree that defendant is entitled to an additional day of presentence custody credit and, with respect to count 2, should have been ordered to pay a $40 security fee pursuant to section 1465.8, subdivision (a)(1) and a $30 court facilities assessment pursuant to Government Code section 70373, subdivision (a)(1). We conclude the parties are correct and will order that the abstract of judgment be amended.

3.      On page 9, under the heading "**DISPOSITION**," the sentence "The judgment is affirmed" is deleted and the following is inserted in its place:

The clerk of the superior court is directed to amend the abstract of judgment to reflect that defendant is awarded 118 days of presentence custody credit in addition to 17 days of presentence conduct credit and, with respect to count 2, is ordered to pay a $40 security fee and a $30 court facilities assessment. A copy of the amended abstract is to be sent to the Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.

This modification constitutes a change in the judgment.
Appellant's petition for rehearing is denied.

_____
*EPSTEIN, P. J.                    WILLHITE, J.                    SUZUKAWA, J.

2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B238002 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA380466) |
| v. | |
| ANTONIO POBLANO RODRIGUEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Rand S. Rubin, Judge.  Affirmed.

Christopher Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II and Mark E. Weber, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Antonio Poblano Rodriguez appeals from the judgment entered following his conviction by jury of making criminal threats with the use of a firearm and exhibiting a firearm. (Pen. Code, §§ 422, 12022.5, subd. (a), 417, subd. (a)(2).)[1] He contends the trial court erred by allowing a witness to testify despite the prosecutor's failure to comply with the discovery statute and denying his requested instruction. Defendant alleges the trial court's errors denied him a fair trial in violation of the federal and state Constitutions. We discern no error and affirm.

## STATEMENT OF FACTS

### I.    The Prosecution Case

At approximately 11:00 a.m. on January 22, 2011, Desiderio Aguilar, a tow truck driver, was dropping off a car at a body shop. He parked in an alley near the shop entrance and entered the shop to transact his business. He gave an invoice to one of the shop employees, Lizeth Estrada. According to Estrada, Aguilar appeared happy. Aguilar left the office and while returning to the tow truck, he saw defendant speaking to another shop employee. Defendant was asking where the "fucking driver" of the tow truck was. Aguilar told defendant it was his truck, apologized, and said he was leaving.

Aguilar continued toward the truck. Defendant was complaining that tow truck drivers were always blocking his driveway. Aguilar apologized and told defendant he needed to be more polite, as he was not treating Aguilar with respect. Defendant, who was yelling at Aguilar, cursed and said he was not the one who needed to be polite because it was Aguilar's fault for parking his tow truck in front of defendant's garage. Aguilar continued to apologize, stating he did not know what else to say. Defendant threatened to shoot Aguilar. When Aguilar asked whether he was really going to shoot, defendant repeated his threat.

---

[1]    All further statutory references are to the Penal Code.

2

Defendant walked into his garage. Through the open door, Aguilar saw defendant retrieve a black semiautomatic handgun and pull the slide back to load a round in the chamber. Aguilar noticed there was a person in the window of the apartment adjacent to the alley, who appeared to be watching. Aguilar had not seen the person before and was not sure if he would recognize him. Defendant came out of the garage with the gun and again threatened to shoot Aguilar. Aguilar told defendant to shoot if he was going to because Aguilar was calling the police. Defendant told him to do so because the police were not going to believe the word of a wetback.

Aguilar tried to call 911 on his cell phone, but was unsuccessful. Defendant told him to move the truck. Aguilar responded that he was not going to do anything until the police arrived. Defendant said he was going to hit Aguilar and approached. He no longer had the gun. Aguilar went into the body shop.

Aguilar asked Estrada for the number to the sheriff's department. Aguilar appeared scared and was shaking. He told Estrada that the neighbor in front of the body shop had pulled a gun on him and he called the sheriff's department. Estrada knew Aguilar was speaking about defendant.

When Aguilar and a shop employee went back into the alley, defendant and the car Aguilar had seen in defendant's garage were gone. When deputies arrived, Aguilar told them what had happened during his encounter with defendant.

About an hour later, as deputies were wrapping up their investigation in the alley, defendant and another person arrived in defendant's car. Aguilar identified defendant as the person who threatened him with the gun and told police he wanted to press charges. Aguilar denied having any weapons or threatening defendant while they were in the alley.

Los Angeles County Sheriff's Deputy Vincent Cisneros and his partner responded to Aguilar's call. When Cisneros arrived, defendant was being detained by other deputies. Cisneros spoke with Aguilar, who was trembling and appeared as if he wanted to cry. After Aguilar told the deputy he had seen the gun in defendant's garage, Cisneros asked defendant whether he could search the garage for the weapon. Defendant signed a consent form and told Cisneros where the gun was located. The deputy went into the

3

garage and recovered the firearm, which had rounds in the magazine and one in the chamber. According to Cisneros, when the slide of the gun is pulled back, a bullet moves from the magazine into the chamber. Aguilar told Cisneros that when defendant retrieved the gun from the garage, he put a round in the chamber. Cisneros searched Aguilar's tow truck and found no weapons.

The jury heard a recording of Aguilar's call to the sheriff's department.

## II.     The Defense Case

On January 22, 2011, as defendant was preparing to go to work, he noticed a tow truck and a pickup were blocking the entrance to his garage. He went to the doorway of the body shop and asked one of the employees who owned the "damn tow truck." The employee pointed inside the shop and defendant said he needed the truck moved. A few seconds later, Aguilar emerged from the shop and defendant told him he needed the truck moved because he had to go to work. Aguilar responded, "Relax, old man, relax." It appeared that Aguilar was going to move the truck, but he turned and walked back into the shop. Defendant told him to move the "fucking truck."

Five minutes passed and Aguilar came out of the shop. Defendant again told him to move his "fucking truck." Aguilar responded that defendant could not speak to him that way. After defendant replied he could speak to him any way he wanted, Aguilar got in defendant's face and said he would move the truck when he was finished with his business. Aguilar then stated he was going to call the police. Defendant called him a stupid, ignorant wetback for believing the police would allow Aguilar to park his tow truck in front of defendant's garage.

Aguilar became angry. He went into the cab of the tow truck and jumped out with a tire iron in his hand. Defendant backed up into his garage. Aguilar advanced, telling defendant he was not so tough. Defendant got a gun he kept in the drawer of a work bench and cocked it. With the barrel of the gun pointed toward the ground, he told Aguilar to back off. Aguilar asked defendant whether he was going to shoot him and defendant said, "No, dumb ass, back off." As Aguilar backed away, he called defendant

4

a "fucking coward." Defendant put the gun in the drawer. Someone from the shop moved the pickup away from the garage door. Defendant got into his car and drove away.

Defendant did not call the police because on prior occasions they took too long to respond. When he returned home with a friend, deputies took him out of the car at gunpoint. He was handcuffed and placed in a patrol car. Defendant told the deputies about the dispute he had with Aguilar, explaining that he got the gun after Aguilar approached him with a tire iron. Defendant directed the deputies to the gun in the garage.

## III.    The Prosecution Case on Rebuttal

Leonel Cervantez lives in an apartment near the alley where the body shop is located. On January 22, 2011, he heard arguing and looked out his window. Defendant was telling a man to move a car. The man told defendant to give him a minute and he would move the car. Cervantez then heard the man say, "Don't point that gun at me or I'm going to call the police." Cervantez could see the man was standing by a tow truck and did not move during the argument. Defendant was in the garage. Cervantez saw that the tow truck driver had a cell phone in his hand.

The first time anyone from the police or the district attorney's office spoke to him about the incident was at 6:30 a.m. on the previous Friday. (Cervantes testified on a Tuesday.) The prosecutor, a district attorney investigator, and the tow truck driver appeared at his door. On the day of the incident, Cervantes gave the tow truck driver his name and contact information.

## DISCUSSION

Defendant claims the court erred by allowing Cervantez to testify. He argues the prosecution violated the discovery statute by failing to provide his counsel with Cervantez's name and a report containing his statement. At this juncture, it is essential to set forth the sequence of events that led to Cervantez's testimony at trial.

5

Aguilar began testifying on the morning of August 10, 2011. During his testimony on direct examination, Aguilar referred to a witness who saw the argument and tried to signal to Aguilar. The attorneys asked to approach the bench. Defendant's counsel informed the court that she had no discovery pertaining to this witness, to which the prosecutor replied, "Me[,] either." The prosecutor explained that she did not know whether Aguilar had talked to this person or if the person yelled something from the window. The court invited counsel to interview Aguilar with respect to the witness and took a recess.

After the recess, the court conducted a hearing out of the presence of the jury, during which Aguilar testified to what the man in the window said. Aguilar stated that after defendant started yelling and went into his garage, the man signaled to Aguilar that he was going to call the police. Later, when defendant emerged from the garage with the gun, the man shouted that he was going to call the police.

The court then stated, "Let me just ask, it's obvious that we don't have the neighbor[,] right?" The prosecutor answered, "Correct. I don't even know who he is." The attorneys argued whether the neighbor's statements were admissible. Defendant's counsel, in discussing the call Aguilar made to the sheriff's department, acknowledged that Aguilar referred to a neighbor. The court deferred ruling on the admissibility of the neighbor's statements and declared a recess.

When the attorneys returned to court, the prosecutor said that she and defendant's counsel interviewed Aguilar, who informed them that he had given the "name and information" of the witness to one of the responding deputies. That information did not get recorded in the police report. The court denied the prosecutor's request to admit the witness's statements to Aguilar during the incident.

Two days later, on August 12, the prosecutor informed the court and defense counsel that at 6:30 that morning, she and a district attorney investigator located the neighbor witness, Cervantez. The prosecutor stated: "I did speak with him. He indicated that he heard yelling. He could see the victim standing in the alley. He told the victim to call the police. He saw that the victim had a cellphone in his hand and the victim was

6

yelling, don't shoot me. He could not see the defendant at the time because the defendant was in the garage. And, from his perspective, I did take a picture from his apartment and the view that he showed me that he had, that you could not see inside the garage but you can see directly across the alleyway to where the victim was standing."

The court asked whether Cervantez could offer testimony as to whether Aguilar ever had a tire iron or a crowbar. The prosecutor replied, "I asked him that, if the victim had — when I asked him, I said, did the victim have anything in his hand, and he said only a cellphone."

Defendant's attorney objected to Cervantez's proposed testimony, alleging she had been provided no discovery. She conceded that his name was mentioned during Aguilar's call to the sheriff's department, but the transcript of the call was "very, very confusing." She argued that she had prepared the defense based on the witnesses who had been disclosed and defendant would be prejudiced if Cervantez was allowed to testify.

The court stated that it was inclined to allow Cervantez to testify in rebuttal, noting that the prosecutor had complied with discovery rules with respect to rebuttal witnesses. It indicated that if defendant testified Aguilar brandished a tire iron during their confrontation, Cervantez's testimony would be relevant. Despite the prosecutor's claim that she had no way of knowing prior to trial that Cervantez was a witness, the court ruled it would not allow him to be called during the prosecutor's case-in-chief.

On August 16, just prior to his being called as a witness, defense counsel objected to Cervantez's testimony on the grounds that she had not been provided with his rap sheet or a written witness statement. The prosecutor said she had prepared a statement the night before and presented counsel with a written statement and Cervantez's rap sheet. Although the prosecutor wanted to elicit Cervantez's testimony with respect to prior contacts he had had with defendant, the court determined that it would allow Cervantez to testify only about the incident in the alley.

Defendant urges the "prosecutor violated her statutory duty of disclosure in two ways. First, she failed to disclose the name and address of a witness, 30 days prior to

7

trial. . . . [¶] . . . [¶]  Second, the prosecutor violated her ongoing duty of disclosure because she had obtained Cervantez's oral statement as of 6:30 a.m. on Friday, August 12, 2011.  [Record citation.]  However, the prosecutor did not disclose the content of the oral statement to defense counsel until four days later."  He is incorrect on both counts.

Defendant argues the "prosecutor's office had known of the witness in the upstairs window for six months prior to trial," as Aguilar had referred to the witness during his preliminary hearing testimony.  Section 1054.1 sets forth a prosecutor's obligation to disclose certain materials and information to the defense.  He or she is required to disclose "[t]he names and addresses of persons *the prosecutor intends to call as witnesses at trial*."  (§ 1054.1, subd. (a), italics added.)  It is clear from the record that the trial prosecutor discovered Cervantez was a potential witness during Aguilar's testimony before the jury and defendant does not contend otherwise.  At the earliest, the prosecutor formed the intent to call Cervantez after she and defense counsel interviewed Aguilar during a recess.  After the interview, both counsel knew Cervantez was a witness to the argument in the alley and possessed information regarding how to contact him.  The prosecutor took the initiative to locate and interview Cervantez.  Defendant's attorney had the same opportunity to do so and chose not to.  The prosecutor fulfilled her obligation to notify the defense that Cervantez was a possible witness at the earliest opportunity.  Put simply, this is not a case where the prosecutor withheld information regarding a witness she knew she would call at trial.

Defendant suggests the prosecutor was derelict by failing to produce a written report of her interview with Cervantez until four days after it had taken place.  His complaint that he was blindsided by Cervantez's testimony is belied by the record.  He ignores the fact that on the morning the prosecutor interviewed Cervantez, on the record, she informed the trial judge and defense counsel of his statements.  At this point, there was no written report to produce.  The prosecutor delivered a written report on the morning Cervantez testified.  Any delay in providing that report was harmless because Cervantez was allowed to testify only to those observations that had been disclosed to the

8

defense in open court. Nothing prevented defense counsel from speaking to Cervantez in the four-day interval between his initial interview with the prosecutor and his trial testimony.

Defendant also faults the trial court for failing to advise the jury of the prosecutor's untimely disclosure of a witness. As we have concluded that the prosecutor complied with the discovery statute, the court's refusal to give the requested instruction was proper.[2]

There was no impropriety in the proceedings. Defendant's constitutional right to a fair trial was not infringed.

## DISPOSITION

The judgment is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

SUZUKAWA, J.

We concur:

EPSTEIN, P. J.

WILLHITE, J.

---

[2]    Defendant asserts the court concluded that the prosecutor could have found the witness sooner. Assuming the court's assumption was correct, a prosecutor is obligated to provide information regarding a witness of whom he or she is aware only when a determination has been made to call that witness at trial. That obligation was fulfilled here.

9